IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEL RAE MCHUGH,

|                        |                  |                     |
|------------------------|------------------|---------------------|
|                        | Plaintiff,       | OPINION AND ORDER   |
| v.                     |                  | 08-cv-721-wmc       |

JO SKALSKI, LUCINDA DELAP, RHIANNON
GRADY, MICHAEL CADOTTE,[1] KATHY
MOODY and THE WISCONSIN LABORERS
HEALTH FUND,

Defendants.

---

In this civil case filed pursuant to 28 U.S.C. § 1983, plaintiff Dela Rae McHugh alleges that for a one-month period between June 7 and July 7, 2006, the individual defendants working at the St. Croix Correctional Center were deliberately indifferent to her serious medical needs in violation of the Eighth Amendment. Before the court is defendant Kathy Moody's motion for summary judgment. Dkt. #34.[2] For the reasons that follow, no jury could find that defendant Moody was deliberately indifferent to plaintiff's serious medical need. Thus, her motion will be granted.

---

[1] The caption has been revised to provide the correct spelling of defendant Cadotte's last name.

[2] Defendants Skalski, DeLap, Grady and Cadotte filed a separate motion for summary judgment (dkt. #26) that will be addressed in another opinion.

UNDISPUTED FACTS

Viewed in a light most favorable to plaintiff, the following facts are material and undisputed.[3]

### A.  Parties

At all times relevant to this case, plaintiff Dela Rae McHugh was a prisoner incarcerated at the St. Croix Correctional Center in New Richmond, Wisconsin, where defendant Kathy Moody was employed by Country Nurses, Inc. as a registered nurse[4].

### B.  The Challenge Incarceration Program

The Challenge Incarceration Program "is an approximately 180-day discipline and

---

[3] In several instances, plaintiff failed to cite to evidence in the record that supports her version of the facts.  *See, e.g.,* Plt.'s PFOF, dkt. #51, ¶¶ 39, 66 and 89.  As set forth in the court's "Procedure To Be Followed On Motions For Summary Judgment" attached to the preliminary pretrial conference order (dkt. #20 at 13), a party disputing a proposed finding of fact must state a contrary "version of the fact *and* refer to evidence that supports that version."  Dkt. #20, II.D.2 (emphasis added).  While not changing the ultimate outcome, defendant's proposed facts are accepted as undisputed to the extent plaintiff failed to cite to evidence to support a disputed fact.  Dkt. #20, at 10, ¶3 ("A fact properly proposed by one side will be accepted by the court as undisputed unless the side *properly* responds to the proposed fact and establishes that it is in dispute.").

[4] For purposes of this motion, the parties assume, and so therefore does this court, that defendant Moody is a state actor acting under the color of state law for purposes of this 1983 claim, which is almost certainly correct though need not be decided here.

treatment oriented program.  CIP's activities involve intensive instructions in military drill, ceremony and bearing, physical exercise and manual labor, personal development counseling, substance abuse treatment and structured educational programming."  Moody Decl., dkt. #37, exh. 2 at 1.  The program requires participating inmates to engage in physical training. There are five forms of physical training: (1) formal physical training; (2) physical performance standards and testing; (3) remedial physical training; (4) disciplinary physical training; and (5) recreational physical training.

Formal physical training involves daily sessions consisting of seven-day rotations of different exercises that target specific areas of the body, such as upper body, lower body and cardiovascular.  These sessions typically involve running, marching, push-ups, sit-ups, jumping jacks, a flexed arm hang, arm circles, mountain climbers and completion of an obstacle course.  A sergeant must be on duty supervising all scheduled formal physical training sessions.  Health Services Unit staff, like defendant Moody, are not required to attend or supervise these sessions.

Health Services Unit staff are authorized to place inmates on activity restrictions if the inmate develops an injury or becomes ill, provided the staff member determines that the inmate is unable to participate in the required physical training sessions.  When an inmate is put under physical restriction status, the Health Services Unit staff member issues the inmate a white armband to be worn at all times, which signifies to other staff members at

3

the institution that the inmate has a physical restriction with respect to physical training. The Health Services Unit staff also issue inmates a 3-by-5 restriction card that lists the inmate's physician or staff-imposed restriction. The card is placed in the inmate's armband, and it identifies the inmate's physical restrictions and any exercises the inmate may substitute during physical training.

Each individual corrections officer and staff member is expected to examine an inmate's restriction card to determine the scope of the physical restrictions placed on the inmate by the Health Services Unit. Health Services Unit staff rely on correctional officers to follow the medical restrictions on inmates' restriction cards. Only Health Services Unit staff may remove an inmate's medical restrictions.

In addition to activity restrictions, an inmate may be placed on "sick bunk." "Sick bunk" is intended to be used when an inmate is too ill to participate in programming or has an injury requiring him or her to remain in bed or immobile. An inmate may be placed on "sick bunk" by medical or other institutional staff *or* by the inmate him or herself. Each day an inmate remains on "sick bunk" may or may not count towards graduation from the Challenge Incarceration Program. The decision as to whether a "sick bunk" day counts is left to the discretion of the supervisory staff.

On September 9, 2005, plaintiff McHugh voluntarily signed an agreement to participate in the Challenge Incarceration Program. By agreeing to participate in the

4

program, McHugh agreed that, among other things, she would abide by all the rules and policies associated with the program and that failure to comply with the rules and policies could result in discipline, including removal from the program.  As with any inmate participating in the program, McHugh could be removed from the program at the sole discretion of the superintendent.  Behavior resulting in removal includes inadequate progress in treatment, disobeying staff orders and disruptive conduct.  The length of time an inmate is removed from the program and placed in "quitter" status is left to the discretion of program staff.

McHugh participated in the program from January 6 through August 3, 2006. Through June 7, 2006, she was not reprimanded or sanctioned for misbehavior.

### C.  Treatment of Plaintiff's Injury

#### 1.  Injury and Initial Treatments

On June 7, 2006, McHugh stepped in a hole and tripped while running during formal physical training.  As a result, she suffered immediate and severe pain in her left hip.  On June 8, 2006, McHugh asked to be seen by the Health Services Unit.  That same day she was examined by defendant Moody, a registered nurse in the Health Services Unit.  McHugh reported her pain to be centralized in her groin area.  Moody performed an in-depth evaluation of McHugh's left hip and groin area.  Moody observed that McHugh walked with

5

a limp, but was able to support her body weight on her left leg without an increase in pain. Moody did not see any evidence of redness or swelling, but she did detect "a small palpable mass" in the groin area, with an increase in pain upon palpation. Moody recorded that McHugh's circulation, motion, sensation and hip range of motion were intact and that McHugh was able to bend, flex and rotate at the waist without difficulty. Moody determined that McHugh had an alteration in "musculoskeletal comfort."

Defendant Moody placed McHugh on a complete activity restriction. She ordered that McHugh (1) not participate in any form of physical training or running for one week and (2) not perform any lifting or bending for one week. Moody told McHugh to elevate her leg while sitting and to ice her hip and groin area three to four times a day for 20 minutes. Moody also filled out a restriction card detailing McHugh's activity limitation and provided her with a white armband. Moody instructed McHugh to return to the Health Services Unit in one week to reexamine her hip condition.

On June 12, 2006, McHugh returned to defendant Moody for her reexamination. McHugh reported that her hip was feeling somewhat better, but that the area tightened up when she was sitting and walking. Although her hip was tender to palpation, no "nodes" were present upon palpation. McHugh did not exhibit any signs of discomfort when pushing her leg out to the side. Moody reaffirmed her original diagnosis, noting an alteration in musculoskeletal comfort. Moody also continued her order that McHugh not participate in

6

any form of physical training or running. Moody did direct McHugh to ride the stationary bike and to stretch during the program's physical training sessions to assist with the rehabilitation of her hip. Moody completed another restriction card to this effect. Moody instructed McHugh to be reexamined on June 15 or earlier if needed.[5]

On June 15, 2006, McHugh returned to the Health Services Unit for her reevaluation.[6] McHugh stated that her hip pain was better than before. An examination of McHugh revealed "no masses or lumps" in her hip area. The diagnosis of McHugh's injury as an alteration in musculoskeletal comfort was confirmed. The restrictions she had received on June 12 were continued until June 20. Her rehabilitation order to use the bike, stretch and ice was also continued. McHugh was ordered to return for yet another examination on June 20.

## 2. Aggravation of Injury and Additional Treatment

For purposes of this motion, it is assumed that defendant Sergeant Michael Cadotte

---

[5] The parties dispute whether (1) between June 12 and June 16 McHugh told defendant Moody that riding the bike was increasing her pain, and (2) she told Moody that to obtain the bike to ride each day she had to bend and lift heavy objects stored in front of the bike, which also increased her pain.

[6] Plaintiff does not dispute that she was seen by nurse Judy Boucher for her reevaluation, though her proposed findings of fact state that she was seen by defendant Moody.

told McHugh on June 16, 2006, to march in place facing the wall for 30 minutes during physical training instead of riding the bike, despite the restriction indicated on her card. After marching, institutional staff provided McHugh with crutches because her hip pain had increased making it difficult to stand or walk.

The next day, McHugh contacted nurse Joyce Carrol Deer about her hip and groin pain. McHugh explained that (1) she had injured herself when she stepped in a hole; (2) she was on a physical training restriction; (3) she had recently ridden a stationary bike, stretched and marched in place; (4) she was icing and elevating her leg; and (5) she was taking Ibuprofen four times a day. McHugh further explained that sitting too long caused her pain. Deer concluded that McHugh had an alteration in comfort and diagnosed her with a pulled muscle. Deer recommended that she use a warm compress four times a day in addition to her regiment of icing and stretching and that she follow up with Health Services Unit staff.

Two days later, McHugh was seen by nurse Boucher, and explained that on June 16, she had been required to march in place for 30 minutes contrary to her activity restriction card. McHugh explained that she had been unable to stand or walk since and that she had been given crutches. She also complained of increased left hip pain. Boucher noted that McHugh was able to stand on her left leg with no pain, but exhibited some pain twisting at

her hips.[7]  Continuing McHugh's medical restrictions, Boucher also diagnosed McHugh with an alteration in musculoskeletal comfort and ordered her transported to Westfields Hospital Emergency Room for further evaluation.

That same day, McHugh was examined in the hospital emergency room by Dr. Allen Medini.  Dr. Medini noted that McHugh had the normal range of motion in all her joints with tenderness over the anterior superior iliac crest and sartorius muscle.  An x-ray was performed on her hip.  Dr. Medini interpreted the x-rays of McHugh's left pelvic and hip area as normal, with no abnormalities or evidence of pelvic or proximal femur fracture.  At that time, the doctor diagnosed McHugh as having a "left sartorius muscle strain" and "IT band syndrome", noting that McHugh's condition was stable and that she was to follow up at the hospital in seven days.

McHugh's visit with Dr. Medini was recorded in her medical chart at the institution, which indicated that her x-ray showed no fracture and that she was to participate in physical therapy, to take naproxen and Tylenol, to ice her hip and groin, and not to participate in physical training for two additional weeks.

On the 20th of June, two doctors at the institution approved Dr. Medini's orders and

---

[7] Boucher also advised McHugh to file a grievance against sergeant Cadotte, which she did that same day.  Ultimately, McHugh's grievance was affirmed and sergeant Cadotte was instructed to always follow Health Services Unit's orders regarding inmate's medical restrictions.

authorized McHugh to attend off-site physical therapy and a follow-up visit at the hospital. McHugh was also reexamined by nurse Boucher. McHugh was still using crutches and indicated that she was in less pain than the day before.

Though disputed,[8] McHugh also maintains that she was seen by defendant Moody on June 20th, at which time (1) she told Moody that sergeants Grady and Cadotte were ignoring her medical restrictions and forcing her to perform exercises during physical training outside the scope of her restrictions; and (2) Moody responded that there was nothing she could do.

Two days later, on June 22nd, McHugh was taken back to Westfields Hospital to attend physical therapy with Brian Lease. At that time, McHugh stated that she had been stretching and avoiding running and that her hip was showing improvement, but that she had re-aggravated her hip problems when she marched. McHugh explained that she had been on crutches for approximately one week and her hip was improving again. She also reported being normally pain free when she rested and that her current pain was 2 on a 1 to 10 scale, with the latter being most severe. McHugh explained further that although she remained in the Challenge Incarceration Program, she was not participating in the daily

---

[8] Defendant Moody avers that McHugh did not tell her anything on June 20th because Moody did not work that day, which appears accurate in light of the work records submitted by Moody. Moody's 2nd Decl., dkt. #65, ¶3, exh. 1.

physical training at that time.  Therapist Lease's proposed short-term goals for McHugh were that she be able to walk without crutches in two weeks and that she have full range of motion in her hip.  His long-term goals for her were that she be pain free and able to jog, as well as participate in physical training.  Lease's plan was for McHugh to perform therapy exercises, a home exercise plan and modalities as needed 2 to 3 times a week for two weeks and then on an as needed basis.  Lease scheduled McHugh for follow-up physical therapy appointments on June 26 and June 28.

Also on the 22nd, defendant Moody reexamined McHugh.  Moody noted that McHugh's hip area was tender to the touch and that her hip pain was a 5 on a 1 to 10 scale.  Moody continued McHugh's physical training restrictions and ordered her to continue taking her medications as ordered.  During that exam, McHugh told Moody that she needed more time to take her diuretic medication during approved bathroom time because her crutches slowed her down.  Moody accordingly noted the need for additional intervention time on her restriction card.

McHugh also told Moody that after she had filed a grievance against sergeant Cadotte his behavior toward her had gotten worse.  Specifically, she told Moody that Cadotte was ordering her to engage in physical activities outside the scope of her restriction card.  Moody advised McHugh to take the issue up with the superintendent -- the defendant Jo Skalski -- because Moody had no authority over corrections officers to discipline them for any reason.

11

Moody also personally contacted the superintendent to inform her of McHugh's problems with the sergeant.

On June 26th, McHugh had her second physical therapy session with Lease.  Lease noted that McHugh's condition had improved and that she could bear weight on her left leg without pain but still needed crutches for ambulation.  McHugh told Lease that her hip and groin areas were tight in the morning but improved throughout the day and that she no longer noticed a "catching" in her hip or groin since her last appointment.  Lease noted that McHugh's hip extension was within normal limits and that she had no hip pain in sitting. Lease provided McHugh with a home exercise plan that included standing hip flexor stretches, a prone knee stretch and ambulation with one crutch in order to allow weight bearing on her left leg in hope of progressing to no crutches when she was able.

On June 28th, McHugh returned to Westfields Hospital.  McHugh attended her physical therapy session first, where Lease noted that her condition continued to improve and that she was able to walk without crutches at times.  McHugh continued to report stiffness in the morning and some pain with lateral movement.  Lease also noted that when McHugh bore weight on her left leg she had increased pain in her hip.

After the physical therapy session, McHugh was taken to the hospital emergency room for a check-up on her hip.  She reported that her condition was much improved and that the physical therapy was helping.  McHugh was examined by Dr. N. Melby, who

12

diagnosed her as having "left hip greater trochanteric bursitis."  Melby ordered that she continue physical therapy, that an iontophoresis patch with cortisone be applied to her left hip and that she take Ibuprofen four times a day for 10 days.

Upon returning to the institution, McHugh was again seen by defendant Moody. McHugh told Moody that she thought she was getting better.  Moody instructed her to perform the stretches and exercises Lease had prescribed and noted in her file that she had been given an iontophoresis patch.  Moody continued McHugh's no physical training or running restriction and indicated that she could use one or two crutches as necessary. Moody told McHugh to return to the Health Services Unit on June 30 for a check-up.  After meeting with McHugh, Moody called Lease to discuss her condition.  Lease told Moody that it was okay for McHugh to use crutches when she experienced pain but that she should try to be weaned off her crutches by June 28.

On June 30, McHugh went to see nurse Boucher in health services.  McHugh told Boucher that she wanted to see a physician because her most recent physical therapy session had not helped reduce her pain.  Boucher noted that McHugh was scheduled for physical therapy that same day.  McHugh went to physical therapy with Lease later that day.  She complained to Lease of increased soreness in her lateral hip.  Although she had no pain when resting, her left lateral hip was tender to touch and she limped when not using crutches. Lease discussed a new home exercise plan with McHugh, which included performing all

13

physical training exercises in the Challenge Incarceration Program except for running and climbing.  Lease recommended that McHugh gradually decrease her use of crutches and that she stop using the crutches by July 5.  Lease informed the institution that McHugh was to avoid running and impact exercises, but that she was permitted to participate in all other physical training exercises.  He also noted that McHugh should gradually decrease from one to zero crutches within the week.

On July 3, 2006, McHugh told institution staff that she had hit her left foot on the floor while walking with crutches.  She explained that the hit caused her pain in her hip.  McHugh was permitted to finish her daily work sitting in a chair and was given a second crutch for mobility.

3.  Final Treatment of Plaintiff's Hip

Two days later, on July 5th, defendant Moody reexamined McHugh, who complained that she was having trouble walking since hitting her foot.  This examination revealed that McHugh's manual range of motion in her left leg and hip was good.  No pain was noted upon palpation of McHugh's left groin and hip.  Although McHugh refused to stand without crutches during the examination for fear of falling, Moody noted that she had demonstrated weight bearing ability on her left side when she was not consciously placing weight on that side.  Moody, therefore, maintained the diagnosis that McHugh had an "alteration in

14

musculoskeletal comfort." Even so, Moody allowed McHugh to use her crutches continually despite Lease's direction that she be eased off using them. Moody told McHugh that her activity restrictions would remain in place until July 7th when she would be reevaluated. (The parties dispute whether McHugh told Moody on July 5th that it was very, very painful for her to walk or stand.)

After the exam, Moody told captain DeLap, sergeant Grady and sergeant Nash to monitor McHugh's activity over the next two days in order to better assess her actual ability.[9]   Later that same day, Moody observed McHugh sitting on the floor with her leg bent and in no apparent pain. Moody did not believe that McHugh should have been able to sit in that manner given the pain she was complaining about. Moody informed McHugh that she could continue to use her crutches but that she would be reevaluated the next morning.

On July 6th, defendant Moody observed McHugh carrying a large bag and walking with her crutches. Later that day, Moody, captain DeLap and McHugh's social worker, Ms. Gergen, met with McHugh in the Health Services Unit to discuss her medical issues. The group discussed several issues, including McHugh's carrying big bags and a sewing machine,

---

[9] Defendant proposes facts about Moody speaking with a physical therapist by the name Adam. McHugh disputes those facts because no "Adam" worked as a physical therapist at that time. Defendant replied by noting that the correct name was "Everett" and that Moody had incorrectly recorded his name. Because McHugh did not have an opportunity to respond to Moody's changed proposed fact, those facts will not be considered.

15

her sitting on the floor, using crutches, failing to ask for help with activities, her failure to follow health services orders to apply ice to her injury and the physical therapist's direction that she be weaned off crutches.  (The parties dispute whether McHugh was told that she was faking her pain and trying to manipulate the system.)

In that meeting, DeLap gave McHugh three choices:  (1) quit the program and return to the women's prison; (2) go on sick bunk, during which time she may lose credit toward graduating from the program; or (3) stop using her crutches.  McHugh was told that if she wanted to finish the program, she would need to do so without crutches.  Defendant Moody recommended that McHugh choose to go on sick bunk for several days in order to take care of herself and get better.  McHugh decided instead to give up her crutches and not take sick bunk.  She limped out of the meeting without her crutches.

After the meeting, defendant Moody called the physical therapy department at the hospital to inform them of McHugh's continued difficulty with ambulation.  Moody was told to continue to observe McHugh's gait and ambulation.  Moody then went to speak with the institution superintendent about McHugh's situation but the superintendent had left for the day.

On the morning of July 7th, defendant Moody met with the institution's superintendent, Skalski, and told her that she believed that McHugh should be reevaluated at the hospital emergency room because Moody could not properly assess her hip joint

16

without another x-ray.[10]  Moody and Skalski then met with McHugh and expressed their concern for her health.  During the meeting they decided that McHugh should be sent to the emergency room for further evaluation and treatment.  At the emergency room it was determined that McHugh had fractured her left hip.  She was admitted to Westfields Hospital and surgery was performed on her left hip that same day.

McHugh was discharged from the hospital on July 10th, and she was placed on sick bunk upon her return to the institution.  McHugh graduated from the Challenge Incarceration Program on August 3, 2006.


OPINION

Under Fed. R. Civ. P. 56, summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  In deciding a motion for summary judgment, the court must view all facts and draw all inferences from those facts in the light most favorable to the non-moving party.  *Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).  Nonetheless, the party that bears the

---

[10] The parties dispute whether at some other time on July 7th, Skalski witnessed McHugh crying while attempting to do push-ups during physical training but did nothing to stop her from doing the push-ups.  They also dispute whether Skalski, Grady and Cadotte witnessed McHugh crying while trying to walk during a physical training session that same day.  Neither fact is material to Moody's subject motion.

burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, through responses to or the proposal of additional, affirmative facts, that there is a genuine issue of material fact that requires a trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Hunter v. Amin*, 583 F.3d 486, 489 (7th Cir. 2009) (quotation omitted).

The applicable substantive law will dictate which facts are "material."  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  A factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248; *Roger Whitmore's Auto. Serv., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005).  The court's function in a summary judgment motion is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249; *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).  No such issue is presented on this record.

### A.  Deliberate Indifference to Serious Medical Need

The Eighth Amendment prohibits prison employees from showing deliberate indifference to prisoners' serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To defeat defendant Moody's motion for summary judgment on plaintiff's deliberate indifference claim, plaintiff must present facts from which a reasonable jury could infer that

she had a serious medical need and that Moody was deliberately indifferent to that need. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). The record on summary judgment certainly supports a finding, and indeed defendant Moody does not dispute, that plaintiff had a serious medical need. Several medical professionals, including Moody, recognized her hip injury as needing treatment; McHugh complained that the injury caused intense pain and she required crutches to alleviate the pain; and in the end, McHugh needed surgery to fix a fractured hip. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006) (objectively serious medical need is one diagnosed by physician as mandating treatment); *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996) (significant pain can evidence serious medical need). The parties' dispute, therefore, centers on whether a reasonable jury could find that defendant Moody was deliberately indifferent to plaintiff's hip injury.

The parties do not dispute that defendant Moody treated McHugh's injury. The issue here is whether Moody's treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate [plaintiff's] condition." *Snipes v. DeTalla*, 95 F.3d 586, 592 (7th Cir. 1996) (internal quotations omitted). The undisputed facts and reasonable inferences from those facts preclude finding that defendant Moody's treatment of McHugh rose to the level of deliberate indifference to her serious medical needs.

To rise to the level of deliberate indifference, defendant's treatment must have been

19

so far afield of accepted professional standards as to imply that it was not actually based on a medical judgment. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996). All the evidence shows to the contrary. Moody's treatment was founded on several in-depth examinations and McHugh's own feedback about her pain level and recovery. Additionally, Moody's treatment was confirmed by several doctors, nurses and at least one physical therapist. Until the second x-ray of plaintiff's hip on July 7, 2006, which Moody requested, no one knew that plaintiff was suffering from a fractured hip. Therefore, nothing in the undisputed facts would permit a reasonable jury to find that Moody's treatment of plaintiff's hip injury was not actually based on medical judgment.

Additionally, McHugh agrees that Moody never witnessed McHugh engaging in physical activities outside the scope of her restrictions and that as a Health Services Unit staff member, Moody had to rely on correctional officers to follow the medical restrictions on McHugh's restriction card. There is also no dispute that the correctional officers were required to follow the restrictions Moody placed on McHugh. No jury could find that Moody acted far outside of professional standards in relying on (1) the correctional officers to follow the medical restrictions she issued, as required; (2) the institution's grievance procedure McHugh invoked to address circumstances involving officers who did not follow medical restrictions; and (3) the superintendent who was in charge of overseeing officers' performance of their duties.

Finally, between July 6 and 7, when Moody permitted McHugh to chose to relinquish use of her crutches instead of following Moody's suggestion that she go on sick bunk to help recover from her hip injury, there is no evidence that Moody was aware that McHugh was suffering from anything more than a hip muscle strain.  When McHugh stopped using her crutches, her physical therapist had recommended that she be finished with the crutches by then, she had only been diagnosed with a muscle strain or trochanter bursitis, an x-ray had revealed that she had no hip fracture, and she had been seen engaging in activities using her left hip without indicating she was experiencing pain.  Further, when McHugh declined sick bunk and relinquished her crutches, Moody called the hospital, spoke with the superintendent and, within a day, decided that plaintiff should return to the emergency room for a reevaluation.  No jury could find that Moody's decision to permit plaintiff to forgo using her crutches and decline taking sick bunk on July 6 was not actually based on a reasonable medical judgment, much less the product of deliberate indifference to a serious medical need.

### B.  Failure to Protect

Despite challenging defendant Moody's treatment in her complaint, plaintiff seems to alter the nature of her claim on summary judgment.  Plaintiff now explains that she "is not questioning Nurse Moody's medical judgment but her failure to make sure that Plaintiff

21

was receiving the medical treatment prescribed by Nurse Moody, other HSU personnel and outside medical care providers—a failure that amounts to . . . deliberate indifference." Plt.'s Resp. Br., dkt. #50 at 7.  In this sense, plaintiff seems to be arguing that Moody violated her Eighth Amendment rights by failing to protect her from harm when forced to exercise outside the scope of her medical restrictions.

To avoid summary judgment on such a failure to protect claim, plaintiff must provide evidence from which a reasonable jury could find that Moody acted with deliberate indifference.  *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008).  In other words, defendant Moody must have been aware that McHugh faced a substantial risk of serious harm and then disregarded that risk by failing to take reasonable measures to abate it.  *Id.*

According to the plaintiff, Moody was aware that correctional officers were not adhering to McHugh's medical restrictions because: (1) sometime between June 12 and June 16, 2006, McHugh told Moody that despite her activity restrictions, correctional officers required her to lift heavy objects to access the stationary bike; (2) on June 20, she told Moody that officers, including Cadotte, were ignoring her restrictions and she could not ignore their orders; and (3) on June 22, she told Moody that Cadotte had begun treating her worse after she filed a complaint against him.

Accepting these facts, and even assuming from these fact that defendant Moody was aware McHugh faced a substantial risk of serious harm by being ordered to engage in

22

activities outside her restrictions, no jury could find that Moody acted with deliberate indifference.  Instead, the undisputed facts support the conclusion that Moody acted reasonably in responding to the risk posed to McHugh's safety, and reasonable actions are not punishable under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

"'Deliberate indifference' is found where an actor responds *unreasonably* to a substantial and known risk[.]" *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 792 (7th Cir. 2003) (emphasis added); *Farmer*, 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").  Inadvertent error, negligence, gross negligence or even medical malpractice does not constitute deliberate indifference.  *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996); *Snipes v. DeTalla*, 95 F.3d 586, 590 (7th Cir. 1996).

Moody's actions were reasonable in light of the undisputed fact that her position as a nurse gave her no direct power over correctional officers and McHugh had filed an institutional grievance regarding the problems she was having. Although "[p]rison officials are expected to act responsibly under the circumstances that confront them[, they] are not required to act flawlessly." *Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008) (internal

23

quotation omitted); *see also Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) ("The test of deliberate indifference ensures that the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.").

At worst, Moody may have acted negligently in not taking immediate action by either investigating McHugh's complaints herself and confronting the correctional officers or reporting the problems McHugh was having with correctional officers to the superintendent the same day McHugh complained to her, but negligence is not deliberate indifference.

Between June 8 and July 7, 2006, defendant Moody acted in a reasonable manner consistent with her position as an institutional nurse, including providing McHugh with medical activity restrictions, medicine, stretches, exercises, examinations, referrals to the hospital, additional bathroom time to accommodate McHugh's use of crutches and extension of McHugh's use of crutches.  Further, when McHugh told Moody that officers were ignoring plaintiff's medical restrictions and Moody is alleged to have said she was aware of this but had no power to do anything, McHugh had already filed a grievance against Cadotte for having ignored the restrictions.  Plaintiff fails to explain how Moody's reliance on the institution's internal grievance procedure to address McHugh's problem with correctional officers was an unreasonable response rising to the level of deliberate indifference.

Perhaps the outcome would be different if defendant Moody completely ignored McHugh's complaints as McHugh's condition worsened, but that did not happen.  Moody

24

did not merely sit on the information McHugh relayed to her.  Although Moody did not take immediate action, within several days of when plaintiff allegedly told Moody about the officers' actions Moody suggested to plaintiff that she take her complaints regarding the officers' actions to the institution's superintendent, who was in a position to address problems with correctional officers.  Moody also continued to treat McHugh's medical needs.  Finally, Moody even took it upon herself to speak with the superintendent about plaintiff's complaints.  All these actions demonstrate substantially less than deliberate indifference and no jury could find otherwise.

Moody acted reasonably in treating plaintiff's hip injury, as well as in responding to the officers' alleged failure to enforce Moody's treatment orders.  Accordingly, defendant Moody's motion will be granted.

ORDER

IT IS ORDERED that defendant Moody's motion for summary judgment is GRANTED.

Entered this 13th day of April, 2010.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge