IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEL RAE MCHUGH,

                              Plaintiff,                    OPINION AND ORDER

        v.
                                                           08-cv-721-wmc
JO SKALSKI, LUCINDA DELAP, RHIANNON
GRADY, MICHAEL CADOTTE, KATHY
MOODY and THE WISCONSIN LABORERS
HEALTH FUND,

                              Defendants.

---

        During a one-month period in the summer of 2006, plaintiff Del Rae McHugh claims

that the individual defendants working at the St. Croix Correctional Center were deliberately

indifferent to her serious medical needs in violation of the Eighth Amendment.  In a separate

order, this court granted defendant Kathy Moody's motion for summary judgment.  Dkt.

#76.  Before the court is the motion for summary judgment filed by defendants Skalski,

DeLap, Grady and Cadotte.[1]  Dkt. #26.  For the reasons that follow, defendants' motion will

be granted with respect to defendants Skalski, DeLap and Grady, but denied with respect

to defendant Cadotte.

UNDISPUTED FACTS

        Viewing the facts in a light most favorable to plaintiff, the following facts are material

and undisputed.[2]

---

        [1]  All references to "defendants" in this opinion are to these four defendants.

        [2]  This court's earlier opinion deciding defendant Moody's motion for summary
judgment contains an in depth account of many relevant, material and undisputed facts, and

1

On September 9, 2005, plaintiff Dela Rae McHugh signed a voluntary agreement to participate in the Challenge Incarceration Program at the St. Croix Correctional Center. This program is commonly referred to as "boot camp" and inmates that are allowed to participate engage in "a strenuous program of exercise, manual labor, substance abuse treatment, military-like drill, and counseling in exchange for a shorter sentence." *Jones-El v. Grady*, No.02-2406, 2002 WL 31833701, at *1 (7th Cir. Nov. 21, 2002). The idea behind these "boot camp" programs "is to give the inmates an experience similar to that of old-fashioned military basic training, in which harsh regimentation, including drill-sergeant abuse by correctional officers, is used to break down and remold the character of the trainee." *Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996).

The Challenge Incarceration Program "is an approximately 180-day discipline and treatment oriented program. CIP's activities involve intensive instructions in military drill, ceremony and bearing, physical exercise and manual labor, personal development counseling, substance abuse treatment and structured educational programming." Moody Decl., dkt. #37, exh. 2 at 1. Defendant McHugh participated in the program from January 6 through August 3, 2006. As part of the program, she was required to participate in physical training sessions, which typically involved running, marching, push-ups, sit-ups, jumping jacks, a flexed arm hang, arm circles, climbing and completion of an obstacle course.

On June 8, 2006, McHugh went to the Health Services Unit to be examined for an injured groin and left hip caused by stepping in a hole and tripping while running the day

most will not be repeated here, though those undisputed facts provide part of the background for an understanding of this motion.

before.  After examining McHugh, defendant Kathy Moody, a registered nurse in the Health Services Unit, diagnosed McHugh with an alteration in "musculoskeletal comfort," placed her on activity restrictions and provided her with a white armband, which contained a 3-by-5 card listing medical restrictions on her activities for one week, including not participating in physical training or running and not performing any lifting or bending.

Four days later, McHugh returned to the Health Services Unit for reexamination. The diagnosis of her injury remained the same and her restrictions of no participation in physical training or running were continued.  McHugh was directed to ride a stationary bike, stretch during the program's physical training sessions and ice three to four times a day to assist with the rehabilitation of her hip and groin.  A couple of days later, on June 15th, during another examination, McHugh stated that although she continued to have hip pain, it had improved.  Her diagnosis remained unchanged, and her activity restrictions and rehabilitation order were continued until June 20.

 While some non-material details are disputed, the parties agree that on June 16, 2006, McHugh presented her activity restriction card to defendant Sergeant Michael Cadotte and he directed her to face a wall and march in place as opposed to riding a stationary bicycle, which her card listed as the activity she was permitted to perform. Cadotte claims to have acted with the belief that marching in place would be easier on McHugh's groin muscle than riding the bike and would be the better choice to accommodate McHugh's injury.  Believing that she could not disobey Cadotte without suffering serious consequences, McHugh did as instructed and marched in place for thirty minutes.  McHugh cried the entire time she marched because of increased pain in her left hip.  After marching,

the pain in McHugh's left hip had increased to the point that she needed to use crutches to stand or walk.

On June 19th, McHugh went to the Health Services Unit where, following reexamination, her past activity restrictions and rehabilitation orders were continued, along with approval for McHugh to use crutches. She also was referred to the Westfield Hospital emergency room for further evaluation. At the hospital, an x-ray of McHugh's left hip showed no signs of a fracture. McHugh was directed to undergo physical therapy and not participate in physical training for another week.

That same day, McHugh filed a grievance against Cadotte. Two days after the grievance was filed, defendant Captain Lucinda DeLap spoke with Cadotte about having McHugh march in place during physical training. Cadotte explained that he personally believed marching in place would be easier on McHugh's groin muscle than riding a bike. DeLap instructed Cadotte not to change a nurse's order and advised Cadotte that if he did not agree with a nurse's order, he should speak with a supervisor about it, not amend the order. That same day, DeLap emailed defendant Superintendent JoAnn Skalski about her conversation with Cadotte. McHugh's grievance ultimately was affirmed on June 28th and, as a result, Skalski directed DeLap to instruct Cadotte always to follow the Health Services Unit's orders regarding inmates' medical restrictions.

Between June 20 and July 6, 2006, McHugh was seen by nurses, doctors and a physical therapist. Her activity restrictions were continued during this time. At first, the physical therapy seemed to be helping McHugh in rehabilitating her hip injury. On June 28th, McHugh's physical therapist told defendant Moody that although he wanted McHugh

4

to avoid bending, lifting and carrying, she should try to stop using crutches by June 30th.  On June 30th, however, McHugh told an institutional nurse that her last physical therapy session had not helped.  That same day, McHugh had another physical therapy session.  After the session, the therapist ordered McHugh off crutches by July 5th, off all restrictions by July 14th and placed her on a no running, jumping or impact physical training restriction until then.

A couple of days later, McHugh stubbed her foot, which caused increased pain in her hip.  McHugh's use of crutches was therefore extended to July 7th.  Then, on July 6th, defendants DeLap and Moody, along with McHugh's social worker, met with McHugh to discuss her medical issues.  The group discussed several issues, including McHugh's carrying big bags and a sewing machine, sitting on the floor, using crutches, failing to ask for help with activities, failure to follow health services' orders to apply ice to her injury and the physical therapist's direction that she be weaned off crutches.

DeLap gave McHugh three choices:  (1) quit the program and return to the women's prison; (2) go on sick bunk, during which time she may lose credit toward graduating from the program, but would have time to recuperate; or (3) stop using her crutches.  Despite Moody's recommendation that McHugh choose to go on sick bunk for several days in order to take care of herself and get better, McHugh decided to give up her crutches.  Although in great pain, McHugh limped out of the meeting without crutches.

The next day, on July 7th, defendants Cadotte and Sergeant Rhiannon Grady directed plaintiff to do push-ups during physical training.  Defendant Skalski observed McHugh participating in physical training and noticed that she appeared to be in pain.  Moody later explained that McHugh had a scheduled visit in the Health Services Unit that day.  Skalski

attended the visit and informed McHugh that she was concerned about her health.  Skalski

and Moody agreed to provide McHugh with crutches and decided to send McHugh to the

emergency room for another evaluation.

At the emergency room, it was determined that McHugh had fractured her left hip.

She was admitted to Westfield Hospital, and surgery was performed on her left hip that

same day.  McHugh was discharged from the hospital on July 10th, and upon her return to

the correctional center she was placed on sick bunk for recovery.  An inmate is placed on sick

bunk when he or she is too ill to participate in programming or has an injury requiring him

or her to remain in bed or immobile.  An inmate may be placed on sick bunk by medical or

other institutional staff *or* by the inmate him or herself.  The supervisory staff has the

discretion to decide whether each day an inmate remains on sick bunk counts towards

graduation from the Challenge Incarceration Program. Skalski ultimately waived McHugh's

sick bunk days and allowed her to graduate from the program on time on August 3, 2006.


DISPUTED FACTS

Defendants dispute McHugh's averment that at some time between June 8 and July

7, 2006, defendant DeLap was participating in a physical training session and observed

plaintiff crying while she was running with other inmates.  They also dispute her averment

that when she told defendant Skalski on June 22nd that defendant Cadotte continued to

ignore her activity restrictions and was in fact treating her worse since she filed a grievance

against him, Skalski told her that Cadotte was "just doing his job."  Another dispute is

whether Cadotte required McHugh to engage in bicycling sit-ups, twisting toe-touches, push-

ups, including one-legged push-ups and to carry heavy objects, including a sewing machine.[3] Defendants further dispute that some time between June 8 and July 7, 2006, defendant sergeant Rhiannon Grady observed Cadotte requiring McHugh to engage in "physical acts" that were outside the scope of her activity restrictions and required McHugh to engage in "physical acts" that caused her pain. Additionally, defendants dispute that any of them observed McHugh crying during a physical training session on July 7th in which she did push-ups and walking.

OPINION

In their motion, defendants argue that there is insufficient evidence for a reasonable jury to find that they were deliberately indifferent to plaintiff's serious medical needs in violation of her Eighth Amendment rights. In addition, defendants argue that they are protected by the doctrine of qualified immunity. "Qualified immunity shields public officials from liability when they act in a manner that they reasonably believe to be lawful." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). To successfully defeat defendants' qualified immunity defense, plaintiff must establish (1) that "the facts, taken in the light most favorable to [her position], show that the defendants violated a constitutional right; and (2) [that this] constitutional right was clearly established at the time of the alleged

---

[3] In disputing one of defendants' proposed findings of fact, plaintiff asserts that she was required to engage in a form of jumping jacks and "mountain climbers." Plt.'s Resp. to Defs.'s PFOF, dkt. #44, at 14 ¶122. However, none of the cited paragraphs in McHugh's affidavit state that she performed such exercises; and no other evidence is cited indicating that McHugh engaged in such additional exercises. Accordingly, those additional facts will not be considered.

violation." *Id.* (citing *Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009), and *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  This court may exercise sound discretion in deciding which of the two prongs of the inquiry to address first.  *See Estate of Escobedo v. Bender,* No. 08-2365, slip op. at 14 (7th Cir. April 5, 2010)*; Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010) (citing *Pearson*, 129 S. Ct. at 818).

## I.  Constitutional Prong

At the summary judgment stage, plaintiff must "show through specific evidence that a triable issue of fact remains on issues for which [she] bears the burden of proof at trial[;] the evidence submitted in support of [her] position must be sufficiently strong that a jury could reasonably find for [her]."  *Knight v. Wiseman*, 590 F.3d 458, 463-64 (7th Cir. 2009) (internal quotation omitted).  The parties agree that McHugh's hip injury qualified as a serious medical need under Eighth Amendment case law.  Her hip injury was professionally diagnosed as needing treatment and eventually surgery; the injury caused McHugh intense pain, at times requiring she walk with crutches to alleviate it; and ultimately, the injury required surgery to repair a broken hip.  *Johnson v. Snyder*,  444 F.3d 579, 584-85 (7th Cir. 2006) (objectively serious medical need is one diagnosed by physician as mandating treatment); *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996) (significant pain can evidence serious medical need).

But the deliberate indifference component of plaintiff's Eighth Amendment claim also requires her to prove that each defendant acted with a sufficiently culpable state of mind.  *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).  And therein lies plaintiff's problem:

even viewing the facts of record in the light most favorable to plaintiff, there is no evidence from which a reasonable jury could find that defendants Skalski, DeLap and Grady were deliberately indifferent.

Plaintiff correctly points out that a prison official's decision to ignore prescribed medical treatment or restrictions issued for an inmate may establish deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (deliberate indifferent may be manifested by prison guards "intentionally interfering with the treatment once prescribed"); *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (physician assistant's failure to give inmate prescribed medication in conjunction with assistant's angry tone and hanging up on guard asking about inmate's medication created genuine issue of material fact about whether assistant acted with deliberate indifference); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (if proven, allegations that prison doctor refused to follow advice of specialists in treating inmate described deliberate indifference).

An official's action cannot rise to the level of deliberate indifference, however, if he or she was not *aware* of the prescribed treatment and restrictions or of the medical risks posed by disregarding medical directions. *E.g.*, *Chapman v. Keltner*, 241 F.3d 842, 846 (7th Cir. 2001) ("even if the doctor had totally prohibited Chapman from stair climbing, there is no evidence that the officers were *aware* of this blanket ban" (emphasis added)); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 811 (7th Cir. 2000) ("[T]here is no evidence that any deputy thought missing doses of medication for an ear infection would cause a serious injury or loss of hearing. . . .  The deputies' failure to dispense Zentmyer's medication consistently on schedule does not manifest conscious disregard for Zentmyer's health.").  Here, plaintiff

9

falls short of offering sufficient evidence, or even reasonable inferences from the evidence, to uphold a finding that Grady, DeLap or Skalski manifested such a conscious disregard for McHugh's health.

### A. DeLap

Beginning with defendant DeLap, McHugh avers only that DeLap observed her crying once while running with other inmates sometime between June 8 and July 7, 2006. But there is no evidence from which to infer that DeLap knew, or could have reasonably inferred, the cause of her crying was pain from a serious medical injury. Plaintiff also does not aver that she told DeLap about her hip injury or her activity restrictions, nor does she offer other admissible evidence that DeLap was otherwise aware of either.

McHugh was participating in a military-like "boot camp" program, so she could have been crying for any number of reasons. *Cf. Wittmer*, 87 F.3d at 917 (prison's "boot camp" programs "includ[es] drill-sergeant abuse by correctional officers, [and] is used to break down and remold the character of the trainee"). Without suggesting that this fact alone obviates a defendant's knowing intention or wanton disregard of an inmate's pain, any inference that DeLap was aware of a specific medical risk to McHugh in running is merely speculation on this record and cannot withstand summary judgment. *Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008); *see also McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

Moreover, assuming that McHugh was wearing her white restriction armband while running, DeLap's failure to stop her during this single run and check the restriction card in her armband does not rise to the level of deliberate indifference.  To exhibit deliberate indifference, the official "must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'" *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  While perhaps an argument might be made that DeLap should have followed a standard practice for the program of checking McHugh's restriction card, DeLap's failure to do so does not create a reasonable inference that she was aware that running was outside the scope of McHugh's medical restrictions.  Even assuming without deciding that DeLap had a duty to inquire further under these circumstances, DeLap's inaction amounts at most to negligence or (and here one must really stretch) gross negligence, neither of which constitutes deliberate indifference.  *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996); *Snipes v. DeTalla*, 95 F.3d 586, 590 (7th Cir. 1996).

Plaintiff faults DeLap for permitting McHugh to choose to leave the July 6th meeting without her crutches and without taking sick bunk.  But this could not be found to constitute deliberate indifference since DeLap was entitled to defer to the medical opinion of defendant Moody, a registered nurse already granted summary judgment with respect to her treatment of McHugh.  *See* dkt. #76; *Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008) ("In determining the best way to handle an inmate's medical needs, prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals.").

11

**B. Grady**

There also is no evidence from which a jury could reasonably find that defendant Grady was aware McHugh was being forced to exercise beyond her medical restrictions. While McHugh avers that Grady saw defendant Cadotte requiring "physical acts" outside the scope of her activity restrictions, that averment is wholly conclusory and fails to offer any specific facts permitting an inference that Grady was aware of McHugh's activity restrictions, much less that the "physical acts" Cadotte directed McHugh to do violated those restrictions.

As an initial matter, plaintiff's averment leaves one to speculate as to the nature of the "physical acts" McHugh was directed to engage in, having failed to provide any detail about those acts. Such vague statements lack sufficient specificity to establish a genuine issue of material fact. *Roney v. Ill. Dept. of Transp.*, 474 F.3d 455, 462 (7th Cir. 2007); *see also* Fed. R. Civ. P. 56(e) (nonmoving party must respond with "specific facts showing a genuine issue for trial").

Even assuming the "physical acts" consisted of activities outside the scope of the restrictions placed on McHugh, there is no evidence that Grady was aware of that fact, nor had any obligation to be. There is no evidence that Grady ever read McHugh's activity restriction card, that McHugh or anyone else told her of the restrictions on the card, or that a supervisor in the CIP was expected to be aware of every inmate's medical restrictions. Like DeLap, a jury might find negligence in Grady not checking McHugh's restrictions herself but could not reasonably find deliberate indifference on these facts.

McHugh also does not contend that defendant Grady directed her to engage in activities that fell outside the scope of her restrictions. McHugh merely avers that Grady

12

required her to engage in "physical acts" that caused her pain.  This averment not only provides no information about whether Grady was aware that McHugh was in pain -- or that the pain McHugh was suffering was anything more than the result of participating in the boot camp's intensive physical exercise as opposed to the result of "the unnecessary and wanton infliction of pain," *Guiterrez*, 111 F.3d at 1373 -- it provides no evidence to support a conclusion that Grady was aware the acts she directed McHugh to engage in "could result in further significant injury[.]"  *Id.*  Accordingly, no reasonable jury could find that Grady knew of and disregarded the fact that the "physical acts" McHugh was engaged in posed an excessive risk to McHugh's health or safety.  *Farmer*, 511 U.S. at 837.

Similarly, while McHugh avers that on July 7th defendants Cadotte and Grady directed her to perform push-ups, by that time, McHugh had chosen to relinquish use of her crutches, her activity restrictions did not preclude such exercises, and there is no evidence to support the finding that push-ups are an impact activity.  Without evidence of Grady's previous misconduct or animus toward plaintiff, directing her to perform push-ups that day did not constitute disregard of medical orders, nor is it otherwise evidence of deliberate indifference.


## C.  Skalski

There is similarly no evidence to support a finding that defendant Skalski acted with deliberate indifference to McHugh's serious medical needs.  As noted, "'[d]eliberate indifference' is found where an actor responds *unreasonably* to a substantial and known risk[.]"  *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 792 (7th Cir. 2003) (emphasis added);

*Farmer*, 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").  The evidence of record here establishes that Skalski acted reasonably in responding to McHugh's medical needs.

According to McHugh, Skalski told McHugh that defendant Cadotte was "just doing his job" in response to her complaints that Cadotte was ignoring her activity restrictions and treating her worse since she filed a grievance against him.  Although this comment certainly left something to be desired, it must be viewed against the *actions* Skalski took in response, which manifest far less than "deliberate indifference."

At the time the alleged statement was made, Skalski, as superintendent, already was overseeing McHugh's ongoing grievance against Cadotte.  Specifically, when Skalski spoke with McHugh, she already had been informed that DeLap had spoken with Cadotte as part of her investigating the issue raised in the grievance and informed Cadotte to follow McHugh's activity restrictions.  Skalski Aff., dkt. #30, exh. #6.  Pending completion of the institution's grievance procedure, Skalski's decision not to disclose to McHugh what was being done to address her issues with Cadotte was reasonable, at least under a standard of deliberate indifference.  Further, when the grievance against Cadotte was affirmed, Skalski directed DeLap to issue Cadotte a job instruction always to follow Health Services Unit's orders regarding inmates' medical needs.  Thus, Skalski reasonably responded to McHugh's complaints.

While McHugh understandably would have preferred Skalski to confront Cadotte immediately and oversee Cadotte's ongoing interaction with McHugh, neither seems a reasonable expectation.  In any event, "the mere failure of the prison official to choose the

14

best course of action does not amount to a constitutional violation." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Officials are required to act reasonably, not flawlessly. *Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008).

Additionally, McHugh avers that Skalski saw her crying while she attempted to perform push-ups and walk during physical training on July 7th. Defendants dispute that McHugh was seen crying but agree that Skalski noticed that McHugh appeared to be in pain during this physical training. Accepting McHugh's averment, it is undisputed that Skalski's response was to (1) contact nurse Moody to discuss McHugh's medical needs; (2) attend the medical exam McHugh had scheduled that day; (3) inform McHugh that she was concerned with her health; and (4) agree to provide McHugh with crutches and send her to the emergency room for further evaluation. No reasonable jury could conclude this response evidenced conscious disregard for McHugh's health. Instead, Skalski's actions strongly support the opposite conclusion.

### D. Cadotte

Finally, we come to defendant Cadotte, whose conduct is by far the most troubling. The Court of Appeals for the Seventh Circuit has explained that "[i]f a defendant consciously chose to disregard a nurse or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference." *Zentmyer*, 220 F.3d at 812. That court also explained, however, that a few instances of neglect, including failing to follow prescribed treatment -- performed without knowledge that serious consequences may result -- may evidence incompetence but not deliberate indifference. *Id.* (failing to

15

administer medication exactly as prescribed without "additional exacerbating hardships" does not violate Eighth Amendment).

The question here is whether the frequency and degree of Cadotte's disregard for the activity restrictions placed on McHugh and/or his awareness of the medical risks and resulting pain posed by directing McHugh to participate in extensive, physical exercises would permit a reasonable jury to find deliberate indifference. Viewing all the facts here in a light most favorable to plaintiff, the court concludes that a reasonable jury could find Cadotte acted with deliberate indifference when in the face of serious medical risks, Cadotte intentionally, and possibly with malice, chose to disregard medical directions regarding McHugh on more than one occasion.

Plaintiff focuses on Cadotte's one-time direction to McHugh on June 16, 2006, to march in place for thirty minutes, as opposed to ride a stationary bike, as evidence that he was deliberately indifferent to her serious medical need. While Cadotte's action contradicted the activity restrictions placed on McHugh by medical staff, this by itself would not be sufficient to support a finding of conscious disregard for McHugh's health under current law. For example, Cadotte's action taken alone falls short of that in *Gil*, 381 F.3d at 661-62, where a genuine issue of material, disputed fact was found as to whether a medical assistant acted with deliberate indifference as evidenced by the assistant's angry tone and his having hung up on a guard inquiring about the medication. Here, Cadotte claims to have had a valid, though mistaken, reason for having McHugh march in place instead of riding the stationary bike. Indeed, it is undisputed that Cadotte believed that marching would be easier on and better accommodate McHugh's injury than riding the bike. Cadotte

16

simply believed he knew better than the medical staff when it came to activity restrictions.[4] Although he was wrong to depart from McHugh's activity restrictions established by CIP's medical experts, as evidenced by the job instruction later issued to him by his superiors, that mistake alone might establish negligence or gross negligence, not deliberate indifference.

Moreover, Cadotte's circumstances would not raise a genuine issue about whether his disregard of McHugh's activity restriction on June 16th was done with malice.  Although plaintiff claims in her brief that Cadotte witnessed her crying in pain as she marched, there is no factual support for this in the record.[5]  There also is no evidence that Cadotte was aware that McHugh was suffering extreme pain from having to march.  McHugh never told Cadotte that she was in pain and he never saw her in pain until after the incident when she needed crutches to walk.  Further, the disputed facts about Cadotte throwing McHugh's

---

[4] Cadotte's belief that he knew better than the Health Services Unit is evidenced by the fact that when DeLap confronted him about his treatment of McHugh, told him that it did not matter what he thought, and directed him not to change a nurse's order without a supervisor's approval.  Skalski Aff., dkt. #30, exh. #6.  DeLap noted that although Cadotte agreed to follow nurses' orders, he did not like that decision.  *Id.*

[5] In her brief, McHugh also states that Cadotte saw her crying and ignored her.  Plt.'s Br., dkt. #43, at 6.  But the proposed finding of fact and the affidavit cited by McHugh fail to support this statement.  In fact, there is no evidence from which to draw the inference that Cadotte witnessed McHugh crying while she marched.  There is nothing to foreclose the possibility that Cadotte directed McHugh to march and then left her to go supervise other inmates.  Thus, on the record before the court, deciding that Cadotte saw McHugh crying while marching would be based on mere speculation, which is insufficient to defeat a summary judgment motion.  *Gunville v. Walker*, 583 F.3d 979, 986 (7th Cir. 2009) ("In order to draw an inference in favor of a nonmoving party, there must be some evidence from which to draw the inference.  But there is nothing more here than speculation and innuendo.") (citing *Liu v. T&H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1999) (a party must present more than mere speculation or conjecture to defeat a summary judgment motion)).

17

restriction card on the ground and making a comment to other inmates that if they did not

slow down, McHugh would file another grievance, did not occur until *after* the incident when

Cadotte had ordered McHugh to march in place.

If the marching incident were the only incident between Cadotte and McHugh, then

Cadotte's actions would only reasonably be found to be nothing more than negligence or

gross negligence.  But it was not.

McHugh avers that after the marching incident, Cadotte directed her to engage in

additional exercise activities that fell outside the scope of her restrictions, such as bicycling

sit-ups, twisting toe-touches, push-ups and one-legged push-ups.[6]  Drawing all reasonable

inferences in favor of plaintiff, these additional orders were given after Cadotte not only was

aware that having McHugh exercise outside the scope of her medical restrictions worsened

her injury and resulted in her having to use crutches to alleviate the pain, but after DeLap

had told Cadotte to follow all Health Services Unit staff orders regarding inmates' medical

restrictions.  A jury could reasonably find that ordering McHugh to engage in additional

exercises violating her medical restrictions despite having such knowledge and despite direct

orders to the contrary amounts to a conscious disregard for McHugh's health rising to the

level of reckless conduct.  *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Qian*

---

[6] A problem with this averment is that there are no specific dates or accounting for these additional occurrences.  Such specific evidence is important to plaintiff's claim because how many times Cadotte issued directives matters.  An isolated instance or two in which a prison official acts with neglect toward an inmate's medical needs may not support a finding of deliberate indifference.  *Gutierrez*, 111 F.3d at 1375.  Nonetheless, even assuming the additional exercises happened only one other time, such minimal evidence merely makes the deliberate indifference inquiry a close call, which is still better left for a jury in light of the other evidence of possible animus.

*v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)) ("'deliberate indifference' is simply a synonym for intentional or reckless conduct, and that 'reckless' describes conduct so dangerous that deliberate nature of the defendant's actions can be inferred").

In other words, although Cadotte may not have been certain his orders would result in a worsening of McHugh's injury, he was at least engaging in a reckless game of chance akin to Russian Roulette, with each additional exercise being another pull of the trigger.  In fact, McHugh's injury did get worse as she participated in Cadotte's physical training, going from difficulty walking, to needing crutches to walk, and finally to suffering a fractured hip bone.  Moreover, Cadotte's arguable disdain toward McHugh -- as evidenced by his allegedly throwing her restriction card on the ground and ridiculing her limitations in front of other inmates (after she filed a grievance against him) -- occurred at the same time he issued these additional exercise orders.  In considering such actions, a reasonable jury may or may not find that Cadotte acted with malice toward McHugh and that directing her to perform these additional exercises was done to inflict unnecessary pain on McHugh.

In the end, there is not any one of Cadotte's action that by itself rises to the level of deliberate indifference.  It is when all these additional, disputed incidents are viewed in conjunction with the initial marching incident that a jury could find Cadotte acted with deliberate indifference.  Similar to the medical assistant in *Gil*, there is just enough intentional interference with the inmate's medical treatment to permit a finding that the actions were malicious.  Plaintiff's success depends on whose version of the story is correct, Cadotte's or McHugh's.  Deciding which story is more credible is not the court's function in a summary judgment motion; the weighing of evidence and determination of the truth of

19

the matter is the function of a jury. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Because a reasonable jury looking at all facts together could find that Cadotte was deliberately indifferent toward McHugh's serious medical needs, plaintiff has satisfied her burden under the constitutional prong of Cadotte's qualified immunity defense, at least for purposes of summary judgment.

## II. Clearly Established Prong

Because "the purpose of qualified immunity is to protect public officials from guessing about constitutional developments at their peril, the plaintiffs have the burden of showing that the constitutional right was clearly established." *Gonzalez*, 578 F.3d at 540. A plaintiff can accomplish this "by showing that there is 'a clearly analogous case establishing a right to be free from specific conduct at issue' or that 'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Id.* (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). Finally, "[w]hen the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial." *Gonzalez*, 578 F.3d at 540.

Plaintiff contends that the right of an inmate to be free from a guard's intentional interference with prescribed medical treatment or restrictions was established in *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). As already discussed, plaintiff's contention is not only persuasive but supported by the Court of Appeals for the Seventh Circuit's decision in *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (physician assistant's failure to give inmate prescribed medication in conjunction with assistant's angry tone and hanging up on guard

asking about inmate's medication created genuine issue of material fact about whether assistant acted with deliberate indifference).  If plaintiff can prove her case at trial -- which will require a jury to believe her version of the disputed facts over defendant Cadotte and at least some of his coworkers -- her circumstances would be analogous to those found in *Gil*. Because the clearly established prong of the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial.

In this case, as in *Gil*, a prison official refused to follow a medically prescribed treatment for an inmate with knowledge that he was acting contrary to the prescribed treatment and where such actions were accompanied by circumstances from which a jury could reasonably infer that the official may have been acting out of malice towards the inmate.  Thus, an inmate's right to be free from a prison official's intentional interference with a prescribed medical treatment could be clearly established if Cadotte repeatedly disregarded the medical restrictions placed on McHugh.

Defendants' contention that the specific facts confronting Cadotte entitle him to qualified immunity are unpersuasive.  Defendants argue that McHugh had the choice, and perhaps even a duty, under prison rules to (1) disregard Cadotte's orders, (2) stop engaging in the exercises he ordered her to perform, or (3) place herself on sick bunk if she could not perform the exercises he ordered.  According to defendants, McHugh's failure to exercise one of the choices created a self-inflicted Eighth Amendment violation and Cadotte cannot be liable for McHugh's self-inflicted punishment resulting from her failure to comply with a valid prison rule, even if he himself were deliberately, repeatedly ignoring medical restrictions on McHugh's activities.  In other words, defendants contend that McHugh should have

challenged Cadotte's authority, even though he was her supervisor in a military-style boot camp program where obedience to authority is paramount and then, on more than one occasion, deliberately disobey his orders. While this may well have been the better course, particularly in hindsight, the court is not prepared to usurp the jury's role in deciding if it was realistic under the circumstances.

Despite defendants' argument to the contrary, McHugh's circumstances are not comparable to those found in *Rodriguez v. Briley*, 403 F.3d 952, 952-53 (7th Cir. 2005). The inmate in *Rodriguez*, 403 F.3d at 953, was ordered by prison staff to put his belongings in a storage box before he could leave his cell and go to the cafeteria; the request was in line with a prison rule regarding storage of belongings. He refused to put his stuff in the box and his failure to comply with the valid prison rule resulted in him missing 300 to 350 meals over an 18-month period. *Id.* at 952. The Court of Appeals for the Seventh Circuit explained that "[a]s soon as Rodriguez puts his belongings in the storage box, he can leave his cell and go to the cafeteria. So he was not punished . . . . Rather, by failing to comply with a reasonable condition on being allowed to leave his cell, and as a result missing out on meals, Rodriguez punished himself." *Id.* at 953.

In this case, McHugh was not choosing to punish or inflict pain on herself rather than comply with a "reasonable condition" to remain in the program. Instead, viewing the facts in a light most favorable to plaintiff, McHugh arguably was repeatedly being subjected to activities that were unreasonable under CIP's own standards. The fact that McHugh chose to stick out the program despite Cadotte's repeated efforts to "wash her out" by ignoring

22

medical restrictions does not alleviate his possible responsibility for resulting pain and injury.

ORDER

IT IS ORDERED that the motion for summary judgment (dkt. #26) is GRANTED with respect to defendants Skalski, DeLap and Grady and DENIED with respect to defendant Cadotte.

Entered this 23rd day of April, 2010.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

23